# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 04-20159-CR-GOLD/BANDSTRA(s)(s)(s)(s)(s)

**UNITED STATES OF AMERICA**

vs.

**JOSE MIGUEL BATTLE, SR., et al.,**

     **Defendants.**

_____/



## UNITED STATES' MEMORANDUM OF LAW
## RE: ENTERPRISE'S MONEY LAUNDERING ACTIVITIES

The United States of America, by and through the undersigned Assistant United States

Attorneys, pursuant to the Court's *ore tenus* order on March 16, 2005, hereby files this memorandum

of law and proffer addressing matters relating to the various money laundering activities of the

charged enterprise in the present case. Specifically, the Court wanted the Government to address

the following:

> My issue is, when money was distributed as percentages or profits to Battle, Jr., and
> Mr. Rydz, and these monies, in turn, were used to establish legal businesses or what
> purported to be legal businesses, what type of -- what are the legal requirements with
> respect to RICO conspiracies for that kind of situation.

\* \* \*
                                   149

> THE COURT: Okay. So, why don't you address the issue for all the businesses,
> including Trends, and then with regard to the businesses, the further question of how
> do I address the issue, assuming you can show initial relevancy with the first
> business, about moving money into subsequent businesses, and what is your proffer
> with regard to how do I know what money is moved, what is legitimate versus not
> legitimate?

\* \* \*
                                   150

> THE COURT: And then I want you to identify for me the exhibits pertinent to each
> business and proffer for me the relevancy of those exhibits to the matters that you're
> briefing so I have some idea of where the Government proposes to go on this element

2021

of the case.

* * *

THE COURT:  As I said, I'm not interested in briefing on monies moving from New
York to Switzerland or something like that.

* * *

THE COURT:  I'm interested in the Government's position on these businesses and
any monies that moved into them from the bolita business in New York.

March 16, 2006 Trial Transcript at 73 and 149-150.[1]

## I.  PERTINENT SUPERSEDING INDICTMENT ALLEGATIONS

The starting point for addressing the issues raised by the Court is the Superseding Indictment,

returned by the Grand Jury on May 31, 2005.  The Superseding Indictment alleges the following:

### THE ENTERPRISE

2.      An international criminal organization  known by various names,
including the "Corporation" and the "Cuban Mafia" (hereinafter the
"CORPORATION"), existed promoting and carrying on illegal activities in the
United States, the Caribbean, Europe, and Central and South America, and consisted
of the defendants named in this indictment and others known and unknown to the
Grand Jury.

3.      The CORPORATION, including its leadership, membership and
associates, constituted an "enterprise," as defined by Title 18, United States Code,
Section 1961(4), that is, a group of individuals and entities associated in fact.  The
enterprise constituted an ongoing organization whose members functioned as a
continuing unit for a common purpose of achieving the objectives of the
CORPORATION.  The CORPORATION was engaged in, and its activities affected,
interstate and foreign commerce.

### THE STRUCTURE AND OBJECTIVES OF THE ENTERPRISE

4.      The CORPORATION utilized a differentiation of roles in its
membership and associates that facilitated and achieved the objectives and purposes
of the CORPORATION, that is, to profit from and establish, operate, manage,
facilitate, enhance, conceal, promote and protect the CORPORATION and its

---

[1] Because the defendants have raised concerns regarding the relevancy of the Peruvian casino
money laundering venture, the present memorandum of law will also address the Peruvian casino
as well.  See, e.g., March 17, 2006 Trial Transcript at 76-77.

<u>members, associates, activities and objectives</u>.

* * *

> 6.      The objectives and purposes of the CORPORATION included, but were not limited to, the following:
>        a.      The CORPORATION <u>enriched its members and associates through various forms of illegal activity</u>, including but not limited to, acts of murder, <u>money laundering</u>, and the operation of illegal gambling businesses and the illegal trafficking of controlled substances and stolen property;

> b.      The CORPORATION promoted and enhanced itself and the activities of its members and associates;

> c.      The CORPORATION preserved and protected its power, territory, operations, and profits through the use of violence and destruction, including but not limited to, acts of murder, arson, and assault;

> d.      The CORPORATION kept its victims and rivals in fear of it, and in fear of its members and associates, through intimidation and threats of violence and destruction; and

> e.      The CORPORATION <u>undertook all steps necessary to prevent the detection of its criminal activities, and sought to prevent and resolve the imposition of any criminal and civil liabilities</u> upon the CORPORATION <u>and its members and associates</u>, including but not limited to, the use of murder and intimidation directed against witnesses, victims, and others.

* * *

> 10.      The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following:

* * *

> k.      Multiple acts indictable under Title 18, United States Code, Sections 1956 and 1957, that is, <u>laundering of monetary instruments and conspiring to launder monetary instruments</u>.

* * *

-3-

## THE MANNER AND MEANS OF THE CONSPIRACY

* * *

d.      The CORPORATION's illegal money laundering schemes included a scheme involving a series of "puppet" companies, businesses, and assets (hereinafter "PUPPET COMPANIES")During the PUPPET COMPANIES scheme, from at least in or about 1983, and continuing through to the date of the return of this Superseding Indictment, the exact dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida and elsewhere, the members and associates of the CORPORATION did violate the money laundering laws of the United States through various means, including using the PUPPET COMPANIES, and the transfer and commingling of illegal funds through and with other funds and accounts, as well as the creation and perpetuation of "sham" businesses, investments, and employment positions that appeared to be legitimate but were, in fact, a covert method of money laundering, all as an instrument to promote their illegal activities, conceal their illegal proceeds, and avoid their reporting obligations as required by law; and

e.      The CORPORATION's illegal money laundering schemes included a scheme involving a business venture known as the "Crillon" (hereinafter "CRILLON"). During the CRILLON scheme, from at least in or about December 1992, and continuing through to the date of the return of this indictment, the exact dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida and elsewhere,      the members and associates of the CORPORATION did violate the money laundering laws of the United States through various means, including using the development, construction, renovation, ownership, management, operation, and planned sale and wind-up of the CRILLON and its assets, including a casino and hotel complex in Lima, Peru, all as an instrument to promote their illegal activities, conceal their illegal proceeds, and avoid their reporting obligations as required by law.

Superseding Indictment (emphasis added).

## II. FACTUAL PROFFER

The following facts have already been presented during the trial through the testimony of

Abraham Rydz:

Jose Miguel Battle, Sr. ("Battle, Sr."), Manuel Marquez ("Nene"), Jose Miguel Battle, Jr.

("Battle, Jr."), Rydz, and others, were partners in an illegal gambling business in New York.  See,

-4-

e.g., March 10, 2006 Trial Transcript at 96-97. Rydz testified that large amounts of cash generated from the illegal gambling operations were carried outside of the United States to Switzerland and Peru. See, e.g., March 10, 2006 Trial Transcript at 115-116. In particular, Orestes Vidan, Maurilio Marquez and Jose "Barbita" Guererro carried illegal gambling money from New York to Paris, France, where they were supposed to go on to Switzerland to deposit the money in Swiss bank accounts. Id. at 121. Maurilio Marquez was detained in Paris and the money he was carrying was seized. Id at 124.[2] However, Barbita made it to Switzerland with the money he was carrying. Id.

Rydz testified that the money carried to Switzerland and Peru was placed in bank accounts in the name of foreign corporations. See, e.g., March 15, 2006 Trial Transcript at 101 and 128-129. Rydz testified that he and Battle, Jr. utilized Maurilio Marquez as their front man for the foreign corporations. See, e.g., March 10, 2006 Trial Transcript at 127. The foreign corporations then lent money to the various Florida corporations, including Union Financial Research, YMR and Trends, which enabled Battle, Jr. and Rydz to become owners in these companies. See, e.g., March 13, 2006 Trial Transcript at 130 and 132 and March 14, 2006 Trial Transcript at 26-27.

Battle, Jr., Nene and Rydz also utilized foreign corporations to purchase lots in Key Biscayne. March 13, 2006 Trial Transcript at 113-114. Maurilio Marquez was the foreign corporation's representative on the books. Id. The lots were originally purchased by Rydz and Nene, but Nene later sold his lot (in the foreign corporation's name) to Battle, Jr. Id.; see also March 15, 2006 Trial Transcript at 100.

Finally, Rydz testified that Nene, Battle, Sr., and Luis DeVilliers purchased a casino in Peru.

_____

[2] Orestes Vidan was also detained in Paris; however, Rydz could not recall this fact. March 10, 2006 Trial Transcript at 124.

March 15, 2006 Trial Transcript at 91. DeVilliers was also in the illegal gambling business. March 14, 2006 Trial Transcript at 23. Rydz testified that Nene and Battle, Sr. used Maurilio Marquez as their representative in the Peruvian casino venture. See, e.g., March 14, 2006 Trial Transcript at 26-27. Rydz testified at length how this connection between the casino and the foreign corporations was how law enforcement eventually caught Battle, Jr. and Rydz. Id. at 24. Rydz further testified that Battle, Sr. and Nene were still in the New York business.[3] The United States further proffers that witnesses will testify that money from the illegal gambling operations was transported from the United States to Peru for the casino.[4] Rydz also testified how he and Jose "Barbita" Guererro were later involved in an attempt to broker a sale of the Peruvian casino. Id. at 31-32.

---

[3] Rydz testified as follows:

```
                              24
16   Q.  What was your concern about Maurillio Marquez being
17   involved with the casino?
18   A.  What was my concern and our concern?  That was the complete
19   thing.  Without Maurillio Marquez, we had nothing.  We just
20   explained, and Mr. Battle, Jr., explained it in plain Spanish
21   in front of me to Mr. Manuel Marquez, not to use Maurillio
22   Marquez for anything because we didn't want to be connected
23   with them.  That's the reason we left the business and we were
24   working 18 hours a day.  And he asked him as a favor.  He said,
25   "Do not use your brother.  And if you're going to use him, let
                              25
 1   me know."
 2   Q.  And when you say "use him," in what capacity?
 3   A.  In any capacity.  They took him out from Venezuela and they
 4   took him to Perú and they put him together in Perú in the
 5   books, like the owner of the casino, that now the casino is
 6   mixed up with Mr. José Miguel Battle, Sr., and Mr. Manuel
 7   Marquez that were in the business in New York.
```

March 14, 2006 Trial Transcript at 24-25.

[4] For example, the United States intends to call Salvador Ramirez. A copy of a portion of Ramirez' sworn grand jury testimony is attached hereto.

Rydz also testified their motivation was to make money and not get caught.  See, e.g., March 13, 2006 Trial Transcript at 28.

## III. DISCUSSION

### A.  RICO Enterprise Includes Money Laundering Activities Charged

In the present case, the Government has charged the defendants with "being persons employed by and associated with an enterprise" and conspiring to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).  "'A RICO conspiracy differs from an ordinary conspiracy in two respects: it need not embrace an overt act, and it is broader and may encompass a greater variety of conduct.'" United States v. Starrett, 55 F.3d 1525, 1543 (11th Cir. 1995) (citing United States v. Pepe, 747 F.2d 632, 659 (11th Cir.1984) (emphasis added).

The defendants are objecting to the Florida business activities and the Peruvian Casino activities as not being part of the charged enterprise.  As with the Torres murder objection, the defendants are ignoring the breadth of the charged enterprise and, much akin to a variance argument, are essentially asking this Court to find that there were separate RICO enterprises for the Florida businesses and Peruvian Casino that are not part of the present case.  However, this multiple RICO enterprise argument has been repeatedly rejected by this Circuit.

> Cave contends that the district court erred in denying his Rule 29 motion for judgment of acquittal based on a variance between the charges alleged in the indictment and the government's proof at trial. Cave argues that the government did not prove the single RICO conspiracy charged in Count II; instead, he contends that the government at best proved multiple conspiracies, and that this variance affected his substantial rights. In United States v. Watchmaker, this Court rejected a similar argument, stating that "[b]ecause of the variety of activities which may be undertaken by a criminal enterprise, there are few RICO trials in which such a claim could not be made, and it has been soundly rejected by the courts of this Circuit." 761 F.2d 1459, 1477 (11th Cir.1985), cert. denied, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 917 (1986).

United States v. Starrett, 55 F.3d 1525, 1552 (11ᵗʰ Cir. 1995) (emphasis added); see, e.g., United States v. Church, 955 F.2d 688 (11ᵗʰ Cir 1992) (discussed in detail below); United States v. Valera, 845 F.2d 923, 929 (11ᵗʰ Cir.1988) ("While there were many ventures or individual conspiracies, there was also one enterprise, one common purpose, and one over-arching conspiracy."). This Court should likewise reject the defendants' objections to the money laundering evidence and permit the Government to put on its case in chief as to Florida money laundering and Peruvian casino activities.

As with the Torres matter, the starting point in addressing the money laundering activities is the definition of "enterprise." In prior pleadings the Government has already set forth established Eleventh Circuit case law as to the breadth of a RICO enterprise. In particular, the Government cited to the recent Eleventh Circuit case, United States v. Pipkins, 378 F.3d 1281 (11ᵗʰ Cir. 2004), wherein this Circuit discussed the RICO "enterprise"as follows:

> An enterprise can consist of "a group of persons associated together for a common purpose of engaging in a course of conduct ... proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981).

> "[A]n enterprise can exist in the absence of a formally structured group," United States v. Young, 906 F.2d 615, 619 (11ᵗʰ Cir.1990), which can be even "a myriopod criminal network, loosely connected but connected nonetheless." Elliott, 571 F.2d at 898. We have held that there is no difference, for enterprise purposes, between a duly elected corporate board and an "amoeba-like infra-structure" in control of criminal activity. [FN4] See id; United States v. Lignarolo, 770 F.2d 971, 979 n.12 (11ᵗʰ Cir.1985).

> FN4. We have also accepted the analogy that an enterprise could be as amorphous as a "pick-up" basketball game. United States v. Valera, 845 F.2d 923 (11ᵗʰ Cir.1988). In Valera, the defendant in a drug smuggling operation challenged his RICO conviction, arguing that the drug shipment offloads were discrete conspiracies formed only to accomplish a specific mission rather than a RICO enterprise. Id. at 929. We rejected the defendant's argument, as the evidence showed

-8-

that the enterprise consisted of a core group of players, with others that would "sub-in" as needed for each shipment. *Id.* We concluded that "[w]hile there were many ventures or individual conspiracies, there was also one enterprise, one common purpose, and one over-arching conspiracy. <u>Id.</u>

Pipkins, 378 F.3d at 1289.

Turning to the present case, the Superseding Indictment charges and the evidence will establish (and has already established) that the enterprise's illegal activities have included illegal gambling and concealing money through various money laundering ventures. While many of the members and associates have changed, many of the members and associates have remained the same and cross over between the different money laundering ventures. More importantly, however, the goals of the enterprise remained the same, that is, to "profit" from and "conceal" their illegal criminal activities.

The Government notes that the <u>Church</u> case is most instructive on the present issue. Similar to the present case, in <u>Church</u>, the "RICO charges concerned an enterprise that revolved around Coppola and a changing roster of associates and that engaged in a variety of criminal activity over a number of years." <u>Church</u>, 955 F.2d at 690. Specifically, the indictment charged 13 defendants, 11 counts, including RICO and RICO conspiracy counts, and listed 25 predicate acts and 125 overt acts in of the RICO conspiracy. At a "trial that lasted more than three months and included the testimony of more than seventy witnesses, the government showed that from 1973 to 1986 Coppola headed a single, ongoing enterprise engaged, at various times, in importing and distributing marijuana; <u>funneling the marijuana profits into legitimate businesses; concealing Coppola's ownership of the businesses</u>; using violence-including conspiring to murder Coppola associates . . . ." Id. at 691. On appeal, the defendant Coppola argued that he was prejudiced by a variance

-9-

because the indictment alleged one RICO enterprise but the government proved two RICO enterprises at trial. Id. at 697. In analyzing this argument, the court noted the following, which is instructive on the issues raised in the present case with respect to the money laundering activities:

> This Circuit has held that proof of an association's devotion to "making money from repeated criminal activity," United States v. Cagnina, 697 F.2d 915, 921 (11th Cir.), cert. denied, 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983), demonstrates an enterprise's "common purpose of engaging in a course of conduct," regardless of whether the criminal activity is diverse. See also United States v. Masters, 924 F.2d 1362, 1367 (7th Cir.), cert. denied, 500 U.S. 919, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991) (noting that under the RICO statute an enterprise can have diverse objects and that there is rarely a problem determining that the diverse acts of a criminal conspiracy, as opposed to the acts of a predominantly legitimate enterprise, satisfy the statutory requirements).
>
> The government here presented evidence of an association in fact that consisted of Coppola and a changing roster of associates and that was, at various times, engaged in obtaining income from importing and distributing marijuana; secretly laundering the marijuana-trafficking income by funneling it into legitimate businesses; protecting this income by concealing the enterprise's ownership of the businesses; protecting Coppola's interests in the businesses by violence; distributing cocaine; and conspiring to rob a drug dealer. At all times, therefore, the enterprise was devoted to making money from repeated criminal activity, and protecting that money by any means necessary.
>
> The government also offered "evidence of an ongoing organization, formal or informal, and ··· evidence that the various associates function as a continuing unit." Turkette, 452 U.S. at 583, 101 S.Ct. at 2528. The enterprise started out trafficking in marijuana and then began laundering its money through legitimate businesses, primarily Jilly's.

Church, 955 F.2d at 698 (emphasis added). The Court further noted:

> The personnel of the enterprise was not the same from beginning to end, but as it shifted, it displayed continuity. As participants left the enterprise, others joined, each becoming involved in multiple aspects of the enterprise. In United States v. Hewes, 729 F.2d 1302, 1311 (11th Cir.1984), cert. denied,469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985), we explicitly rejected "the contention that Turkette's reference to the enterprise as a 'continuing unit' requires participation of all of its members throughout the life of the enterprise" and found that "shifting associations" whose participants "overlapped to a significant degree" formed an enterprise under the

-10-

statute. *Id.*

Church, 955 F.2d at 698 (emphasis added).

Turning to the present case, similar to the goals of the enterprise in Church, the goals of the defendants' enterprise included "making money" and "secretly laundering" their illegal gambling profits by "funneling it into legitimate businesses." Whether the money laundering activity was purchasing ownership interests in Florida businesses, such as Union Financial Research, YMR or Trends, using foreign corporations (in the name of nominees) to provide loans to back their investments, or purchasing real property, such as the Key Biscayne lots in the name of foreign corporations, or purchasing a casino in Peru, one of the goals of the enterprise remained the same, to wit, to conceal the enterprise's and its members and associates' involvement in the illegal gambling activities. Moreover, while the participants in the enterprise shifted over time and by criminal activity, there was clearly a significant overlap in the members and associates involved. As Rydz emphasized in his testimony on numerous occasions, the most important overlap between the money laundering activities of the enterprise was the use of Maurilio Marquez as the front man for almost all of these money laundering activities. In the end, Rydz believed this overlap is how law enforcement uncovered the enterprise, which lead to the enterprise's ultimate demise.

Finally, the Government has found one Eleventh Circuit case, United States v. Caporale, 806 F.2d 1487 (11th Cir. 1986), wherein this Circuit addressed the admissibility of money laundering evidence in a RICO case, and found such evidence admissible, even when money laundering was not charged in the indictment. In the Caporale case, the Court held that evidence that a defendant charged with RICO conspiracy engaged in money laundering activity was admissible even where the defendant was not charged within the indictment with having engaged in such conduct. The court

based this decision on the fact that in that case, as in the instant case, the indictment charged that among the goals of the conspiracy was the secreting of assets and the concealing of the acts committed in furtherance of the conspiracy:

> Ostrer argues that the government improperly introduced evidence that he had laundered money because the indictment did not charge him with laundering money. Ostrer's argument, as with some of the other appellant's arguments, misreads the indictment. It charged that he ran SAEFA and Fringe Benefits "as, among other purposes, conduits for disguising illegal kickback monies received from DVCC" and that he and the other defendants had agreed to "hide and conceal, and cause to be hidden and concealed, the purpose of the conspiracy and the acts committed in furtherance of the conspiracy." While the indictment does not use the word "laundering," Ostrer's money laundering activity is **clearly encompassed by the language of the indictment**. Beyond that, evidence of money laundering activity would be admissible to establish a predicate act of racketeering for the RICO conspiracy charge, regardless of whether Ostrer was charged with some crime beyond conspiracy or not.

Id. at 1513 (emphasis added). By contrast, and yet more compelling, the Superseding Indictment in the present case, as further detailed in the bills of particulars provided to the defendants, specifically charges the defendants with having engaged in money laundering activity, in addition to the other stated goals of the conspiracy which were present in Caporale. Consequently, the money laundering activity which took place within the framework of the instant conspiracy is even more "clearly encompassed by the language of the indictment," and therefore, should properly be admissible.

## B. Eleventh Circuit Money Laundering Case Law

The Court has also asked the Government to address how the money generated from the illegal gambling moved into the various Florida businesses. The evidence at trial will establish (and has already established) that, in an effort to disguise the true nature, ownership and source of the proceeds that the defendants derived through racketeering activity, they engaged in the purchase of a casino in Peru and purchased what otherwise would have been legitimate assets in the United

-12-

States through the use of foreign corporations.  Such evidence, standing alone, is sufficient to establish the "concealment" prong of the money laundering allegations.

In United States v. Majors, 196 F.3d 1206 (11ᵗʰ Cir. 1999), the Court was determining the sufficiency of the evidence to support a money laundering conviction where "[i]n an elaborate shell game, appellants moved ill-gotten funds in and out of various corporate bank accounts," which was "designed to make the funds ultimately enjoyed by appellants appear as legitimate income not derived from the company" through which they had engaged in illegal conduct. Id. at 1213.  In upholding the conviction, the Court stated:

> Evidence that may be considered when determining whether a transaction was designed to conceal includes, among others, statements by a defendant probative of intent to conceal; unusual secrecy surround the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

Id. at 1213 n. 18, citing United States v. Garcia-Emanuel, 14 F.3d 1469, 1475-76 (10ᵗʰ Cir. 1994) (emphasis original).  In the instant case, the evidence will (and has already) established that the defendants utilized off-shore corporations in the names of nominees, which enabled the defendants to purchase assets in the United States in their own name, all in an effort to disguise their ownership thereof and/or to legitimize the profits which they had derived from other racketeering conduct. Moreover, as noted in Majors, the fact that the defendants commingled their illegally-derived proceeds with what purportedly was legitimate assets provides further proof that the transactions in which the defendants engaged herein were designed to conceal the illegal source of funds and their ownership interests in the foreign entities:

In United States v. Powers, 168 F.3d 741, 747-48 (5ᵗʰ Cir. 1999), petition for cert.

-13-

denied, 528 U.S. 945, 120 S.Ct. 360, 145 L.Ed.2d 282 (1999), the deposit of checks made payable to the ITEX corporation from the Long Valley corporation were disguised by the use of a third party, ITEX. Id. at 748. Checks from Long Valley to ITEX did not reveal that [the defendant] or his wife were involved in the transactions. [The defendant's] connection to ITEX could be discovered only by accessing the bank records of ITEX, finding out that [defendant's wife] had an interest in the account, and then tracing the funds from the ITEX account to the couple's personal account. Id. The Fifth Circuit found that [defendant's] use of ITEX evidenced a sufficient intent to conceal the source of illegal funds and confirmed [defendant's] money laundering convictions. Id. The facts here are very similar. See [United States v.] Burns, 162 F.3d at 847-49 (where an ordinary check transfer between two bank accounts conducted in plain view was the final step of a larger money laundering scheme willfully designed to give the defendant access to the illegal proceeds); United States v. Jackson, 935 F.2d 832, 842 (7th Cir. 1991) (evidence that defendant treated the illegal funds commingled in legitimate church accounts as his own sufficient to support finding of design to conceal); United States v. Termini, 992 F.2d 879, 880 (8th Cir. 1993) (commingling illegal gambling proceeds in legitimate corporate bank accounts sufficient to establish a design to conceal); United States v. Nattier, 127 F.3d 655, 658-59 (8th Cir. 1997) (depositing embezzled funds in the seemingly legitimate business account of IRI and then transferring them to another account in the name of defendant and his father).

Majors, 196 F.3d at 1214.

Furthermore, where, as here, the defendants have commingled the proceeds derived from unlawful activity with other funds, the subsequent transactions in which the defendants utilize those funds are all deemed to have been tainted for money laundering purposes. In addressing this specific issue, the Eleventh Circuit has stated the following:

The issue is whether the government should be required to trace the origin of all funds deposited into a bank account to determine exactly which funds were used for what transaction. Although [defendant] characterizes this issue as one of the sufficiency of the evidence, we believe that initially it is one of statutory construction. The statute requires that a transaction "involve" the proceeds of an activity which the participant knows is unlawful. The question is what Congress intended by the word "involve."

Although this question has not yet been answered in this circuit, we find persuasive the reasoning of the Seventh Circuit in United States v. Jackson, 935 F.2d 832 (7th Cir. 1991). In Jackson, the defendant deposited proceeds from his drug-dealing

-14-

activities into the checking account of the 15th Street Baptist Church, where he was the preacher. The defendant then wrote checks from this account to pay for beepers which were used for drug dealing. After his conviction for money laundering, the defendant argued that no rational juror could decide that the checks alleged in the indictment involved money derived from drug proceeds.

The Seventh Circuit affirmed the conviction, reasoning that:

> We do not read Congress' use of the word "involve" as imposing the requirement that the government trace the origin of all funds deposited into a bank account to determine exactly which funds were used for what transaction. Moreover, we cannot believe that Congress intended that participants in unlawful activities could prevent their own convictions under the money laundering statute simply by commingling funds derived from both "specified unlawful activities" and other activities. Indeed, the commingling in this case is itself suggestive of a design to hide the source of ill-gotten gains ... (citation omitted).

Id. at 840. We agree and hold that Section 1956 (a)(1)(A)(I) allows for convictions where the funds involved in the transaction are derived from a commingled account of which only a part comes from "specified unlawful activities."

United States v. Cancelliere, 69 F.3d 1116, 1120 (11th Cir. 1995).

Similarly, in United States v. Abbell, 271 F.3d 1286, 1294-96 (11th Cir. 2001), the defense argued that, where the government fails to trace directly the funds used in a money laundering transaction, "it must at least show that no source of legitimate income could have generated the funds used or that the funds used came from a source of funds that are commingled with illegally obtained funds." Id. at 1294-95. The Court rejected that argument, finding that "the government's evidence on this point supports a finding that [defendant's] illegal and legal moneys – to the extent legal moneys existed – were commingled, thus tainting all funds originating from [defendant]." Id. at 1295-96. The Court also held that "[t]he amount of illegal money that needs to be combined with another, larger amount of legal money need only be slight to render all the money commingled and,

-15-

therefore, illegal. And, once the illegal and legal moneys are commingled, no passage of time will remove the taint." Id. at 1295 n. 5, citing United States v. Ward, 197 F.3d 1076, 1083 (11th Cir. 1999) ("The district court's theory that the passage of time and the large infusion of legal proceeds remove the taint from the illegal proceeds defeats the purpose of the money laundering statute and promotes money laundering schemes. Because money is fungible, the government must prove only that the tainted proceeds were commingled with other funds.").

## IV. CONCLUSION

Based upon the above proffer and case law, the Government respectfully requests that the

Court permit the Government to present its witnesses and other evidence in its case in chief as to the

Florida business ventures and Peruvian casino.[5]

---

[5] Alternatively, the evidence is also admissible to establish the underlying illegal gambling activity. In upholding the admission of evidence in a CCE case that the defendant had purchased two expensive residences during the time that he was engaged in criminal activity, the Fifth Circuit has held as follows:

> Where a defendant is on trial for a crime in which pecuniary gain is the usual motive for or natural result of its perpetration and there is other evidence of his guilt, evidence of a sudden acquisition or expenditure of large sums of money by the defendant, at or after the commission of the alleged offense, is admissible to demonstrate the defendant's illegal obtention of those funds. Evidence of this type is admissible even though the government does not specifically trace the source of those funds to the illegal acts charged against the defendant because "a dishonest acquisition ... (is) a natural and prominent hypothesis," 1 J. Wigmore, Evidence s 154, at 601 (1940 & Supp.1981), explaining the defendant's affluence. [citations omitted] In the present case there was sufficient evidence that appellant was engaged in a large-scale continuing narcotics enterprise so as to justify, under this principle, the admission as relevant and probative evidence of his receipt of large sums of money. That the funds for these acquisitions may have stemmed from entirely lawful activities, or, as appellant claims, from his gambling, goes to the weight of the evidence rather than to its admissibility.

United States v. Chagra, 669 F.2d 241, 256 (5ᵗʰ Cir. 1982). Similarly, in United States v. Newton, 891 F.2d 944, 948-49 (1ˢᵗ Cir. 1989), the court upheld the admission of evidence that the defendant had purchased real estate and automobiles, and the introduction of defendant's bank, mutual fund and brokerage account records, for a five-year period following his involvement in a narcotics conspiracy. Holding that "[i]t is common ground that the possession of large amounts of unexplained cash in connection with evidence of narcotics trafficking is generally relevant and admissible," and "that is true even if the source of the money is not traced." Id. at 948. The Court further stated that the fact that the transactions involved extended five years past the narcotics activity in which the defendant had engaged did not affect the admissibility of the evidence, stating:

> We do not think, given the large amount of profit derived from this importation, that five years after a crime is too long to destroy the relevance, as a matter of law, of the possession and use of large amounts of unexplained money."

Respectfully submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

By: _____

Juan Antonio Gonzalez
Assistant United States Attorney
Florida Bar No.897388
juan.antonio.gonzalez@usdoj.gov
David A. Haimes
Assistant United States Attorney
Florida Bar No.990116
david.haimes@usdoj.gov
Alicia E. Shick
Assistant United States Attorney
Florida Bar No. 0124842
alicia.shick@usdoj.gov
11200 North West 20th Street
Miami, Florida 33172
Tel. (305) 715-7640/7645; Fax: (305) 715-7639

---

Id. at 948. Furthermore, that the expenditures in the instant case occurred while the criminal conduct was ongoing is of no significance. See United States v. Bolden, 325 F.3d 471, 487-88 (4th Cir. 2003) ("the money laundering statute does not require the underlying criminal activity be completed prior to the money laundering transactions"), citing United States v. Butler, 211 F.3d 826, 829 (4th Cir. 2000) ("Funds are criminally derived if they are derived from an already completed offense, or a completed phase of an ongoing offense").

Thus, in the instant case, the defendants' international movement of funds, and the subsequent purchases which they made in corporate names and in the names of nominees, are relevant and admissible as evidence of their connection with, and acquisition of wealth through, their association with the enterprise.

-18-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this pleading was sent this 24th day

of March 2006, by e-mail and regular mail to:

Juan Antonio Gonzalez
Assistant United States Attorney

Jack R. Blumenfeld, Esquire
**Attorney for Jose Miguel Battle, Sr.**
9130 South Dadeland Boulevard
Suite 1200
Miami, Florida  33156

Maria del Carmen Calzon
**Attorney for Manuel Marquez**
1050 Spring Garden Road
Miami, Florida 33136

Joel Kaplan, Esquire
Lisa Hanley Colon, Esq.
**Attorney for Jose Miguel Battle, Jr.**
100 North Biscayne Boulevard
Suite 1100
Miami, Florida  33132

John Francis O'Donnell, Esquire
**Attorney for Julio Acuna**
2850 North Andrews Avenue
Ft. Lauderdale, Florida  33311

Reemberto Diaz, Esquire and
Stuart Adelstein, Esquire
**Attorneys for Argelio Jimenez**
2929 Southwest 3rd Avenue
Suite 410
Miami, Florida  33129

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION


IN RE:  INVESTIGATION


_____/

Federal Grand Jury 02-01 (MI)
Federal Justice Building
Miami, Florida
Tuesday, July 9, 2002


APPEARANCES:

JUAN ANTONIO GONZALEZ
Assistant United States Attorney.

ROSA CHACON DE ARMAS
Deputy Foreperson


- - - - - -


TESTIMONY

OF

SALVADOR RAMIREZ

CERTIFIED COPY



FERNANDEZ & ASSOCIATES (305) 374-8868

13

1    order not to be kicked out of Peru?

2         A    Yes, yes, yes, she is the individual,

3    yes, yes, of course, but I hadn't known her.

4         Q    What happened at this meeting?

5         A    Well, in this meeting we went ahead and

6    talked about what Mendez was requesting which was an

7    infusion of capital, infusion of money, because it

8    was necessary to pay off debts.  One of the debts was

9    my bank's debt.  Another one was the equivalent of

10   IRS here in this country, the Sunat, the municipality

11   which is the equivalent of what Panellas runs here,

12   a Social Security, which was necessary to pay and

13   there were a series of different debts that had to be

14   paid off.  In addition to that, Mendez also brought

15   his work plan, since he's familiar with how casinos

16   work and the need to bring in different people, the

17   gamblers.  It was around two hundred fifty, three

18   hundred thousand dollars in debt -- just in debts.

19        Q    Now, was there ever an agreement reached

20   about an infusion of capital into the casino by the

21   American partners?

22        A    They came to an agreement.  I felt

23   extremely uncomfortable there at that meeting,

24   because they started fighting among themselves.

25   Essentially Mr. Walled and Mr. DeVilliers were

FERNANDEZ & ASSOCIATES (305) 374-8868

1   fighting.  And Mr. Marquez really performed the

2   function of referee.

3           Q      Did they talk about how it was that they

4   were going to infuse capital into the casino?

5           A      They were finding a way.  I, as a

6   banker, it's very simple if you're having problems

7   with the transfers and that type of thing, there is

8   no problem, we can do it with a bank that actually

9   works with Banex, in Peru.

10          Q      Let me interrupt you at this point.  In

11  the conversation were they talking about physical

12  transporting of United States currency from the

13  United States to Peru?

14          A      That's correct.

15          Q      Now, Banco Banex, in Peru, has a

16  correspondent bank or a sister bank here in the

17  United States; correct?

18          A      That's correct.  There are several

19  sister banks -- special sister banks or corresponding

20  banks here.

21          Q      One of those is Hamilton Bank here in

22  Miami?

23          A      That's right.

24          Q      What did you explain to the people at

25  the party -- at the meeting concerning Hamilton Bank

1   and whether or not it's necessary to physically

2   transport money from the United States to Lima, Peru

3   to deposit in Banco Banez?

4        A      I helped on that.  The argument that was

5   going on, I said, "Why are you arguing?  It's very

6   easy.  You have to take the money to Hamilton Bank.

7   What Hamilton Bank does is goes ahead and puts it in

8   our account and it's sent to Lima.  It's going to

9   cost you fifty bucks.  And the way that works is it

10  goes from your bank to Hamilton Bank and from

11  Hamilton Bank to Banco Banex."

12       Q      And did the partners think that that was

13  a good idea?

14       A      No.

15       Q      Why not?

16       A      That's when Mr. Marquez escorted me out.

17       A JUROR:  Again.

18       A      I was a ping pong ball.  I was going in

19  and out, and I was a ping pong ball and he said, "You

20  don't understand?"  And I said, "what do I not

21  understand?"  He said, "This cannot be transferred

22  this particular way because this is actually as a

23  result of gambling."  I said, "What gambling are

24  you talking about?"  And they said, "You don't

25  understand.  Bolita is a game in New York, and that's

46

```
 1    fine, you can play all the Bolita that you want to

 2    in New York, but the money has to go into the bank.

 3    You're not going to understand.  We're going to send

 4    the money and you don't be concerned, and don't

 5    continue talking about that."

 6         Q    Did he explain to you that he had some

 7    concerns with the IRS and whether or not the IRS

 8    would find out that they had that money?

 9         A    Yes, yes.  He said that he was talking

10    become the IRS, and he was also talking about not

11    paying taxes and I think he was familiar with the

12    fact that in Peru no one was to pay taxes, classical,

13    you know what I mean, and there aren't sanctions that

14    would be done in that particular case.

15         Q    But he told you that one of the reasons

16    why they couldn't deposit in Bolita money in the

17    bank, had to do with the IRS?

18         A    Correct, correct.  He gave me the

19    reason, yes.

20         Q    Did he also try to explain to you what

21    the Bolita was in New York?

22         A    Yes.  He told me that Bolita is a game.

23    To this point I don't know what type of game we're

24    talking about.  Now I know it's an illegal game.

25         Q    Now, did you and Mr. Mendez at some
```